**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.  11-24476-CIV-ALTONAGA/Simonton**

**ROBERTO LOPEZ HURTADO**, *et al.*,

      Plaintiffs,

vs.

**RALY DEVELOPMENT, INC.**, *et al.*,

      Defendants.

_____/

## ORDER

    **THIS CAUSE** came before the Court on Defendants' Motion for Summary Judgment . . . . ("Defendants' Motion") [ECF No. 56] filed by Raly Development, Inc. ("Raly"), General Recycling LLC ("General Recycling"), Bravo Companies Inc. ("Bravo"), Vidal Suriel ("Vidal"), Emmanuel Suriel ("Emmanuel"), [1] Israel Viera ("Viera"), and Danilo Cruz ("Cruz") (collectively, "Defendants"), on May 24, 2012; and Plaintiffs' Motion for Summary Judgment [ECF No. 58] filed by Roberto Lopez Hurtado ("Hurtado"), Jesus Blanco ("Blanco"), and Eddy Gomez ("Gomez") (collectively, "Plaintiffs"), on May 24, 2012.  These cross-motions for summary judgment address several of the same issues concerning Plaintiffs' claims under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. section 201, *et seq.*

## I.  BACKGROUND[2]

    Bravo, a company that buys and resells tires, and has two or more employees who

---

[1]  Emmanuel's name has been spelled in multiple ways in Defendants' briefings.  (*See, e.g.*, Defs.' Mot. 1 ("Enmanuel"); *id.* 9, 18, 19 ("Emmanuel"); Defs.' Statement of Undisputed Material Facts ("SMF") ¶ 3 ("Enmanuel") [ECF No. 57]).  Emmanuel's deposition and the caption of this case use "Emanuel." ([ECF No. 57-7], at 1).  In this Order, the Court employs the spelling most often used in Defendants' Motion, "Emmanuel."

[2]  Many of the disputed facts are addressed in the Analysis rather than in the Background section.

regularly handle these tires, had annual gross revenues or gross sales exceeding $500,000 in 2010 and 2011.  (*See* Pls.' Statement of Undisputed Material Facts ("SMF") ¶¶ 58, 60, 62 [ECF No. 59]; Defs.' Resp. in Opposition to Pls.' SMF ("Defs.' Resp. SMF") ¶¶ 58, 60, 62 [ECF No. 73]; Vidal Depo. 9:13–21 [ECF No. 59-2]; Bravo Depo. (Emmanuel as Bravo's Rule 30(b)(6) representative) 4:24–5:4 [ECF No. 71-1]).[3]  Since Bravo's incorporation in 1997, Vidal has wholly owned Bravo and served as its president.  (*See* Pls.' SMF ¶ 33; Defs.' Resp. SMF ¶ 33; Vidal Depo. 5:12–6:10).  Vidal determines the rate of pay of Bravo's employees.  (*See* Pls.' SMF ¶ 40; Vidal Depo. 14:10–14).  In 2010, Vidal's son, Emmanuel, became Bravo's Director of Operations; on February 9, 2012, he became Bravo's registered agent.  (*See* Defs.' SMF ¶ 3 [ECF No. 57]; Pls.' SMF ¶ 3; Emmanuel Depo. 6:1–3 [ECF No. 57-7]).  Vidal was one of two corporate officers and directors of Bravo from 2010 to 2011.[4]  (*See* Defs.' SMF ¶ 3).

In addition to its tire business, Bravo also owns a corporation named Cima Biam,[5] which in turn owned a plot of land ("Property").  (*See* Vidal Depo. 6:24–7:3).  On an unspecified day, Bravo received a letter from DERM, "the regulatory section of Miami-Dade [County] that looks

---

[3]  The Court notes that in responding to Plaintiffs' Statement of Undisputed Material Facts, Defendants do not expressly admit or deny any of Plaintiffs' statements, but rather provide the Court with a list of facts through which the Court must sift.  (*See generally* Defs.' Resp. SMF).  To the extent any listed fact does not expressly oppose Plaintiffs' corresponding fact, Plaintiffs' fact will be deemed undisputed.  Additionally, the parties include several facts within each numbered paragraph of their respective statements of facts.  (*See generally* Defs.' SMF [ECF No. 57]; Plf.'s Resp. SMF [ECF No. 75]).  To the extent that any party fails to direct the Court to the record evidence in support of its asserted facts (or its reasons for disputing an opposing party's asserted facts) contained in *each* sentence, the Court does not consider those assertions in deciding these motions.  *See* FED. R. CIV. P. 56(e)(4).

[4]  The second corporate officer and director, Ronald Denman, is not a party to this litigation.  (*See* Defs.' SMF ¶ 3).

[5]  Defendants cite to three pages of deposition testimony to support their assertion that "Bravo and Cima Biam have no relationship . . . with the exception that they are both owned by Vidal Suriel."  (Defs.' SMF 8 n.18 (citing Vidal Depo. 7–9)).  The testimony cited to does not support Defendants' assertion that "Bravo and Cima Biam have no relationship."  Rather, the testimony indicates that Bravo owns Cima Biam.  (*See* Vidal Depo. 7:1–3 ("Q. What was the name of the other corporation that your company [Bravo] owns?  A. Cima Biam.")).

after the well-being of the county" (Emmanuel Depo. 9:3–5), requiring Bravo to "clean up" the Property. (*Id.* 8:20–24; *see* Vidal Depo. 19:12–14; Pls.' SMF ¶ 12). As Bravo "generates the money" and owned a "couple of trucks," Bravo contracted with Raly (owned by Viera), and later General Recycling (owned by Cruz), to clean up the Property. (Vidal Depo. 19:14–20; *see* Pls.' SMF ¶¶ 12, 15, 34; Defs.' Resp. SMF ¶¶ 12, 15, 34). Bravo did not use Raly or General Recycling for any purpose other than to clean up the Property. (*See* Defs.' SMF ¶ 13).

Viera is the sole owner of Raly, which operated from August 2010 through August 2011. (*See* Defs.' SMF ¶ 1; Pls.' Resp. SMF ¶ 1 [ECF No. 75]; Pls.' SMF ¶ 55; Defs.' Resp. SMF ¶ 55). Other than the contract it entered into with Bravo for work performed from August 2010 through August 2011, Raly did not enter into any other contract for work as of March 16, 2012. (*See* Pls.' SMF ¶ 9; Viera Depo. 10:22–11:2 [ECF No. 59-4]). Raly's gross sales from August 1, 2010 to June 30, 2011 amounted to $453,381. (*See* Defs.' SMF ¶ 11). This sum is based on deposits made into Raly's bank account. (*See* Pls.' SMF ¶ 11). It is disputed whether Raly's gross sales for July 2011 amounted to no more than $10,000 (*see* Defs.' SMF ¶ 11 (stating that Raly's gross sales for July and August 2011 amount to less than $10,000), or over $44,000 (*see* Pls.' SMF ¶ 11).

Cruz has been the sole owner of General Recycling since the date of its incorporation, August 29, 2011. (*See* Pls.' SMF ¶¶ 47, 50; Defs.' Resp. SMF ¶ 50). Prior to incorporating General Recycling, Cruz worked for Raly from approximately October 2010 through August 2011. (*See* Defs.' SMF ¶ 2; Defs.' Resp. SMF ¶ 44). General Recycling's gross annual sales for 2011 were under $500,000. (*See* Defs.' SMF ¶ 13). As of March 16, 2012, General Recycling has not performed work other than for Bravo. (*See* Pls.' SMF ¶ 52; Defs.' SMF ¶ 52).

During the relevant time period, Bravo first contracted with Raly to be "in charge" of the

Property's clean-up.  (Viera Depo. 6:3–6; *see* Pls.' SMF ¶ 15; Defs.' Resp. SMF ¶ 15).  Some of the heavy equipment used by Raly to clean up the Property included a loader, two bulldozers, a Bobcat, two bucket loaders,[6] and a sieve to clean the dirt.  (*See* Pls.' SMF ¶ 56; Defs.' Resp. SMF ¶ 56; Viera Depo. 17:12–19; 18:15–19:25).  This equipment was owned by Bravo and was present on the Property when Raly first arrived at the site.  (*See* Pls.' ¶ 3; Defs.' Resp. SMF ¶ 3; Viera Depo. 16:18–21).  At least one piece of equipment was purchased by Bravo in North Carolina, and other equipment was purchased in Virginia, Pennsylvania, and Miami.  (*See* Pls.' SMF ¶¶ 59, 61; Defs.' Resp. SMF ¶ 59; Emmanuel Depo. 20:16–23; Vidal Depo. 12:17–22).  Raly did not pay Bravo any fee to use this equipment.  (*See* Pls.' SMF ¶ 3; Viera Depo. 17:2–11).  Whenever equipment broke down, Viera informed Vidal at Bravo who "would take care of it."  (Viera Depo. 18:2–3; *see id.* 17:24–18:14; Pls.' SMF ¶¶ 4, 17, 35).

Raly and General Recycling prepared Plaintiffs' (and their co-workers') payroll and the payment of their wages.  (*See* Defs.' SMF ¶ 15).  Viera informed the workers how much they would get paid.  (*See* Viera Depo. 22:8–11; Pls.' SMF ¶ 43).  Raly paid workers by check and cash.  (*See* Pls.' SMF ¶¶ 29, 57; Defs.' Resp. SMF ¶ 57; Hurtado Depo. 52:8–13 [ECF Nos. 60-4 through 60-6]; Viera Depo. 29:12–17, 54:7–19).

Although Raly did not own any of its own equipment, it purchased some supplies for workers such as gloves, masks, vests, and hard hats.  (*See* Defs.' Resp. SMF ¶¶ 2–3; Pls.' SMF ¶ 2; Viera Depo. 21:13–15).  This expense was listed along with all of Raly's other expenses, such as worker compensation and fuel, and submitted to Bravo on a weekly basis.  (*See* Pls.' SMF ¶ 10; Viera Depo. 21:2–15).  A check for those expenses was then sent and deposited in a bank account held in Raly's name.  (*See* Viera Depo. 20:18–25).

---

[6] These devices are described as "mechanical hand[s] that grab[] the dirt."  (Viera Depo. 19:13–15; *see also id.* 18:15–19:15).

Raly ceased cleaning the Property in approximately September 2011.  (*See* Hurtado Depo. 56:19–23).  Vidal had informed Viera that Raly's services were no longer needed.  (*See* Pls.' SMF ¶ 36; Viera Depo.  43:12–15).  Bravo then contracted with General Recycling to clean up the Property.  (*See* Defs.' SMF ¶ 14).  As General Recycling hired some, but not all, of the people who cleaned the Property under Raly, some of Raly's workers continued to work on the Property under General Recycling. (*See* Pls.' SMF ¶ 53; Defs.' SMF ¶ 53).  General Recycling does not own any equipment.  (*See* Cruz Depo. 15:9–10 [ECF No. 59-3]).  The equipment used by General Recycling to clean up the Property belonged to Bravo.  (*See* Pls.' SMF ¶ 51).  Bravo deducted an hourly usage fee for the equipment from its compensation of General Recycling. (*See* Defs.' Resp. SMF ¶ 51; Cruz Depo. 42:17–43:2).

An environmental engineer, hired and paid for by Bravo, supervised the progress of the clean-up of the Property.  (*See* Pls.' SMF ¶¶ 16, 23; Cruz Depo. 31:11–16); Pls.' Resp. SMF ¶ 22; Vidal Depo. 24:7–10, :23–25).  The purpose of the engineer's presence at the Property was "more of a laboratory-type purpose, picking up some materials that is [sic] there and testing it [sic] to make sure that it's [sic] all clean."  (Vidal Depo. 29:24–30:2).  Another part of the environmental engineer's job was to ensure that excess material, such as metals, was properly disposed of, but he did not supervise any workers.  (*See* Pls.' SMF ¶ 24; Defs.' Resp. SMF ¶ 21; Vidal Depo. 25:6–13, 30:3–7).  The engineer met with Vidal monthly to report on the clean-up's progress.  (*See* Pls.' Resp. SMF ¶ 22; Vidal Depo. 24:11–15).

Vidal and Emmanuel were "in charge" of making sure the Property's clean-up ran "smoothly."  (Emmanuel Depo. 26: 3–6; *see* Pls.' SMF ¶ 28).  Emmanuel went to the Property two to three times per week, for no more than fifteen minutes each time, to check on the progress of the work and inquire whether the rain would allow work to proceed, speaking with Viera and

Cruz.[7]  (*See* Defs.' Resp. SMF ¶¶ 26–28; Pls.' SMF ¶¶ 26, 27).  Vidal visited the Property daily and "supervise[d] . . . the work" done on it.  (Vidal Depo. 11:3–14; *see* Cruz Depo. 32:3–6; Hurtado Depo. 97:22–23).   When Vidal visited the Property, he drove around the site, "look[ing]," but did not get out of his vehicle.  (Cruz Depo. 32:3–7; *see* Vidal Depo. 11:15–18; Defs.' Resp. SMF ¶ 20; Pls.' SMF ¶ 37).  His visits were "from a quality control and safety standpoint . . . to observe generally that the project was evolving."  (Vidal Depo. 27:25–28:5). He spoke with Viera and Cruz,[8] asking about the progress of the clean-up and the effect the rain had on it.  (*See* Hurtado Depo.  11:20–12:6; Pls.' SMF ¶ 18; Vidal Depo. 15:5–9).

In response, Viera and Cruz offered Vidal explanations why certain objectives were not met.  (*See* Vidal Depo. 15:25–16:8).  The parties dispute whether Vidal gave instructions to Viera and Cruz during his visits.  (*See* Pls.' SMF ¶ 20; Defs.' Resp. SMF ¶ 20).

Viera hired Hurtado, Gomez, and Blanco to clean up the Property.  (*See* Pls.' SMF ¶¶ 41, 42; Defs.' Resp. SMF ¶¶ 41, 42).  Before incorporating General Recycling, Cruz worked for Raly as a supervisor.  (*See* Pls.' SMF ¶ 46).  Viera was Hurtado and Cruz's boss when they worked for Raly.[9]  (*See* Pls.' SMF ¶ 45; Cruz Depo. 27:19–24).  Hurtado and Cruz's job was to decontaminate the land and dispose of excess material or metals found on the Property.  (*See* Vidal Depo. 30:11–21; Pls.' SMF ¶ 25; Defs.' Resp. SMF ¶ 25).  Hurtado worked for Raly from approximately September or October 2010 until August 2011.  (*See* Defs.' Resp. SMF ¶ 49; Hurtado Depo. 53:14–17).  Hurtado did not work during the last two weeks of December 2010

---

[7]  More specifically, Emmanuel spoke with Viera when Raly was contracted, and later spoke with Cruz when General Recycling was contracted.

[8]  Again, Vidal spoke with Viera when Raly was contracted, and later spoke with Cruz when General Recycling was contracted.

[9]  The parties dispute whether Cruz served as a supervisor only when Viera was not present (*see* Defs.' Resp. SMF ¶ 46; Cruz Depo. 14:21–23), or whether Cruz "was always the one who supervised the workers and the equipment." (Hurtado Depo. 57:14–16).

(*see* Defs.' SMF ¶ 17; Defs.' Resp. SMF ¶ 15), as well as for one week during September 2011 (*see id.*).  During the duration of Raly's contract, each day Viera was at the Property, Hurtado was also there.  (*See* Pls.' SMF ¶ 5).

In September 2011 when Bravo switched to General Recycling to clean up the Property, Hurtado continued to work on the Property for General Recycling until approximately October or November 2011.  (*See* Pls.' SMF  ¶ 49; Defs.' SMF ¶ 4; Viera Depo. 11:19–22).  While Hurtado worked under Raly and General Recycling, he was supervised "frequently."  (Hurtado Depo. 127:13–15). While Hurtado worked for Raly, Viera and Cruz were the only individuals who controlled his work.  (*See id.* 131:4–11; Defs.' SMF ¶ 15).  If he ever did anything they "didn't like . . . they would correct" him.  (Hurtado Depo.  127:23–25; *see* Pls.' SMF ¶ 7). Although Hurtado relied on the work and money he received from Raly and General Recycling for his "daily bread," he was able to control the hours that he worked during the period he worked for Raly and General Recycling.  (Hurtado Depo. 128:17; *see id.* 129:7–9; Defs.' SMF ¶ 16).

From Hurtado's perspective, he "always worked with the same personnel," and had "always seen the same bosses."  (Hurtado Depo. 85:17–18; *see* Pls.' SMF ¶ 14).  Hurtado spoke personally to Vidal on two occasions.  (*See* Hurtado Depo. 132:24–133:1).  The first was toward the beginning of 2011, and the second was in approximately September 2011, after Raly's departure.  (*See* Hurtado Depo. 132:17–23, 133:3–5).  Hurtado's second conversation with Vidal concerned raising his salary by $1 after it was lowered.  (*See* Pls.' SMF ¶ 19; Hurtado Depo. 132:8–10).

At no time during his work for either Raly or General Recycling did Hurtado perform work with any of his own equipment or tools.  (*See* Pls.' SMF ¶ 1; Viera Depo. 11:12–14).

The parties dispute when Gomez began working for Raly — either from the end of 2010 or sometime in January 2011. (*See* Defs.' SMF ¶ 5, Pls.' SMF ¶ 5). In April 2011, Gomez was fired by Raly for breaking a hose, and therefore did not work about three or four days that month. (*See* Gomez Depo. 80:13–81:1, 81:24–82:2). After Gomez was informed by Viera and Cruz that he was fired, Gomez spoke with Vidal and got his job back. (*See id.* 78:24–79:3; 80:13–18; 82:13–19; Pls.' SMF ¶ 31; Defs.' Resp. SMF ¶ 31). During one week in June 2011, Gomez worked only two or three days during a particular week. (*See* Defs.' SMF ¶ 18). Gomez stopped working for Raly in June 2011. (*See* Defs.' SMF ¶ 5; Pls.' SMF ¶ 5). Gomez did not work for General Recycling. (*See* Defs.' SMF ¶ 5; Pls.' SMF ¶ 5).

Blanco worked for Raly from August 2010 to March 2011. (*See* Defs.' SMF ¶ 6). Blanco did not work for General Recycling. (*See id.*).

It is disputed whether Hurtado worked for Bravo from June 2010 prior to working for Raly and General Recycling. (*Compare* Pls.' SMF ¶ 30, *and* Hurtado Depo. 50:18–51:10 [ECF No. 60-4], *with* Defs.' SMF ¶ 4, *and* Vidal Depo. 7:19–23). Hurtado further maintains that Bravo compensated him in cash for this work. (*See* Pls.' SMF ¶ 29; Hurtado Depo. 50:11–14).

Plaintiffs were "paid with 1099 forms" by both Raly and General Recycling. (Defs.' SMF ¶ 16). They each attached a "Schedule C" to their federal income tax returns, deducting business expenses. (*See id.*). Plaintiffs did not object to receiving 1099 forms. (*See id.*).

This suit was filed on December 13, 2011 (*see* Compl. [ECF No. 13]), amended on December 14, 2011 (*see* First Am. Compl. [ECF No. 5]), and again on March 28, 2012 (*see* Second Am. Compl. [ECF No. 34]).

Hurtado claims he is owed overtime wages for cleaning up the Property from June 2010 through approximately November 2011. (*See* Pl.'s Am. Statement of Claim 1 [ECF No. 17]).

Specifically, he asserts that he (1) first worked for Bravo from June 2010 through approximately August 2010 when Raly was contracted to clean up the Property (*see* Pls.' SMF ¶ 30);[10] (2) worked for both Bravo and Raly, as joint employers, during Raly's tenure  (*see* Am. Compl. ¶ 12); and (3) worked for both Bravo and General Recycling, as joint employers, during General Recycling's tenure (*see id.* ¶ 13).

Gomez claims he is owed overtime wages when he worked for Bravo and Raly, as joint employers, from approximately the end of 2010 or sometime in January 2011 through June 2011. (*See* Defs.' SMF ¶ 5, Pls.' SMF ¶ 5; Am. Compl. ¶ 12).  Blanco claims he is owed overtime wages when he worked for Bravo and Raly, as joint employers, from August 2010 through March 2011.  (*See* Defs.' SMF ¶ 6; Am. Compl. ¶ 12).[11]  All Plaintiffs contend that General Recycling is Raly's successor and is liable for Raly's violations.  (*See* Am. Compl. ¶ 6).

## II.  LEGAL STANDARD

Summary judgment shall be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56(a), (c). "[T]he court must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment."  *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).  "An issue of fact is material if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case."  *Burgos v. Chertoff*, 274 F. App'x 839, 841 (11th Cir. 2008) (quoting *Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (internal quotation marks

---

[10]  This claim is not the subject of any of the disputed legal issues raised in the parties' motions for summary judgment.

[11]  After joining the case on March 28, 2012 (*see* Am. Compl.), neither Gomez nor Blanco filed a Statement of Claim.

omitted)).  "A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Channa Imps., Inc. v. Hybur, Ltd.*, No. 07-21516-CIV, 2008 WL 2914977, at *2 (S.D. Fla. Jul. 25, 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The movant's initial burden on a motion for summary judgment "consists of a responsibility to inform the court of the basis for its motion and to identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (internal quotation marks and alterations in original omitted) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "[T]he plain language of Rule 56 [] mandates the entry of summary judgment [] . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012) (quoting *Celotex*, 477 U.S. at 322).

## III.  ANALYSIS

### A.  Frivolity

Defendants first argue that summary judgment should be granted in their favor because the suit is frivolous.  (*See* Defs.' Mot. 2–3; 16).  In support of their position, Defendants identify portions of Plaintiffs' deposition testimony that represent (1) Plaintiffs were always properly compensated for all hours worked; (2) Gomez did not work overtime for any of the Defendants; (3) Blanco always reviewed his pay and found it to be accurate; (4) Blanco knows he is not entitled to receive any money in the lawsuit; and (5) Blanco worked for Raly only on a part-time basis, and was retired at the time he worked; and (6) Plaintiffs were treated fairly in all of their

dealings with Defendants.  (*See id.*).  According to Defendants, "[t]hese . . . admissions by the Plaintiffs render this lawsuit frivolous."  (*Id.* 3).

As an initial matter, Defendants fail to identify what standard the Court should apply to determine frivolity, which they must do to prevail on their summary judgment motion.  *See Fitzpatrick*, 2 F.3d at 1115 (noting that it is the movant's burden to "inform the court of the basis for its motion" (internal quotation marks and alterations in original omitted)).  Instead, Defendants cite generally to cases concerning motions for sanctions or fees due to the pursuit of frivolous cases. (*See* Defs.' Mot. 3 (cases cited therein)).

Regardless, "in cases where the plaintiffs do introduce evidence sufficient to support their claims, findings of frivolity typically do not stand." *Dulaney v. Miami-Dade Cnty.*, No. 09-23259-CIV, 2011 WL 6754074, at *2 (S.D. Fla. Dec. 22, 2011) (citing *Sullivan v. Sch. Bd. of Pinellas Cnty.*, 773 F.2d 1182, 1189 (11th Cir. 1985)).  Here, deposition testimony also shows with respect to the issues raised by Defendants that: (1) while they may have been properly paid their stated hourly compensation for hours worked, Plaintiffs maintain they were not paid overtime wages as required by the FLSA (*see e.g.*, Hurtado Depo. 179:14–17); (2) Gomez asserts he worked overtime for Defendants (*see* Gomez Depo. 71:15–23); (3) whether Blanco's pay was accurate does not preclude a finding that the amount of pay does not comply with the FLSA; (4) Blanco maintains he is owed overtime pay (*see* Blanco Depo. 118:14, 122:18–24); and (5) Blanco worked more than forty hours in a single week (*see id.*).  Additionally, whether Plaintiffs were treated "fairly" by Defendants does not address whether Plaintiffs are entitled to overtime wages under the FLSA.

For the foregoing reasons, summary judgment in favor of Defendants based on this ground is denied.

## B.  Subject Matter Jurisdiction

The FLSA provides:

> Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek [(i)] is engaged in commerce or in the production of goods for commerce, or [(ii)] is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(a)(1).  Accordingly, the FLSA applies when there is individual coverage, i.e., when the employee "is engaged in commerce or in the production of goods for commerce," or when there is enterprise coverage, i.e., when the employee "is employed in an enterprise engaged in commerce or in the production of goods for commerce."  *Id.*  The parties agree that Plaintiffs do not allege individual coverage (*see* Defs.' Mot. 5; Pls.' Resp. 2), but rather assert only enterprise coverage.[12]

> As is relevant here, an
>
> "Enterprise engaged in commerce or in the production of goods for commerce" means an enterprise that —
>> (A) (i) has employees engaged in commerce or in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person; and
>> (ii) is an enterprise whose annual gross volume of sales made or business done is not less than $ 500,000 (exclusive of excise taxes at the retail level that are separately stated)[.]

29 U.S.C. § 203(s)(1).  "Whether enterprise coverage exists is a question that implicates both the Court's jurisdiction and the merits of the case."  *Gonzalez v. Old Lisbon Rest. & Bar L.L.C.*, 820 F. Supp. 2d 1365, 1367 (S.D. Fla. 2011) (citations omitted).

---

[12]  Defendants request summary judgment on the issue of individual coverage.  (*See* Defs.' Mot. 4–7). Given Plaintiffs' acknowledgment that they have not alleged individual coverage and do not seek to proceed under individual coverage (*see* Pls.' Resp. 2; Pls.' Resp. SMF ¶ 10), there is no disputed issue of law for the Court to decide and therefore Defendants' request is denied as moot.

For enterprise coverage to apply, Plaintiffs must be employees of an enterprise that satisfies both the "commerce" requirement and the "$500,000 gross sales" requirement. The parties do not dispute that the "commerce" element is satisfied, as Plaintiffs handled machinery that moved across state lines, nor do they dispute that Bravo meets FLSA's $500,000 statutory minimum for enterprise coverage to apply. However, they do dispute whether the $500,000 minimum gross sales amount is met by Raly and General Recycling. The parties further dispute whether Defendants were employers of Plaintiffs.

### i. Whether Raly Meets the FLSA's $500,000 Threshold for Enterprise Coverage

The record shows that there is a disputed issue of fact whether Raly satisfies the $500,000 requirement. Raly's corporate income tax return for the period August 1, 2010 through June 30, 2011 shows gross sales amount to $453,381. The sum is based on deposits made into Raly's bank account. Defendants assert that Raly's sales from July through August 2011 amount to no more than $10,000, and therefore, even when considering this added amount, Raly's sales figures from August 1, 2010 through July 31, 2011 do not meet the FLSA's $500,000 requirement. (*See* Defs.' SMF ¶ 11).

Plaintiffs point out however, that in July 2011, checks dated that same month, amounting to $44,485.09, were deposited into Raly's account. (*See* Pls.' Resp. 6 [ECF No. 74]). Using the same accounting method employed by Defendants when filing their corporate income tax return, namely, examining account deposits, Plaintiffs calculate that Defendants' gross annual sales for the period August 2010 to July 2011 amount as $497,866.09. (*See id.*). This is shy of the $500,000 minimum by $2,133.91.[13]

---

[13]  Plaintiffs assert that a check dated August 5, 2011 in the amount of $14,569 should also be partially attributed to Raly's July 2011 sales, as the check was payment for work performed between July 29 and August 4, 2011. (*See* Pls.' Resp. 6). However, Plaintiffs' argument rests on the fact that work was

Nonetheless, Plaintiffs additionally argue that Raly's sales are not wholly reflected by deposits made into Raly's account because Raly also received income in cash. (*See id.*). Plaintiffs appear to suggest that because Raly also partly paid its workers in cash, Raly's cash receipts were not deposited into its bank account, and therefore the accounting method used to calculate Raly's gross annual sales is inaccurate. (*See id.* 6–7). Such cash receipts include monies received for metals collected on the Property. (*See* Pls.' Resp. SMF ¶ 11). The amount of monies received in cash by Raly is disputed, but the record reflects that multiple trips were made to sell collected metals, as often as seven trips per day at one point in time, where payments for those metals were "[a]lmost always [in] cash," in amounts of "800, 900, even up to 1200" dollars. (Blanco Depo. 155:20–25; 157:1–2). Any collected monies, whether by check or cash, were given to Viera. (*See id.* 159:20–24). Such cash payments from August 2010 to July 2011 conceivably amount to more than $2,133.91 given that at least seven trips were made while Blanco worked for Raly, each trip garnering at least $800, mostly in cash.

Defendants assert that all payments for scrap metal were deposited into Raly's bank account and were already included as part of Raly's gross sales figures. (*See* Defs.' Reply 3–4 [ECF No. 85]). Thus, whether Raly deposited all scrap metal payments into its bank account is a disputed issue of material fact relevant to whether Raly meets the $500,000 threshold for FLSA enterprise coverage. Accordingly, summary judgment in favor of Defendants on the issue of whether enterprise coverage applies to Raly is denied.

### ii.   Whether Bravo Formed a Joint Enterprise with Either Raly or General Recycling

The FLSA defines "enterprise" to mean, in relevant part:

the related activities performed (either through unified operation or common

---

performed from July 29 through July 31, which Plaintiffs have not shown. Thus, the Court does not consider any portion of the August 5 check for the purposes of this discussion.

> control) by any person or persons for a common business purpose, and includes all such activities whether performed in one or more establishments or by one or more corporate or other organizational units including departments of an establishment operated through leasing arrangements, but shall not include the related activities performed for such enterprise by an independent contractor.

29 U.S.C. § 203(r)(1). This definition specifically "allows for [FLSA] coverage under a joint enterprise theory." *Cornell v. CF Ctr., LLC*, 410 F. App'x 265, 267 (11th Cir. 2011) (citing *Donovan v. Easton Land & Dev., Inc.*, 723 F.2d 1549, 1551 (11th Cir. 1984)). In other words, the "enterprise" for the purposes of FLSA coverage can be comprised of more than one entity.

The parties ask the Court to rule, as a matter of law, on whether Bravo formed a joint enterprise with either Raly or General Recycling. (*See* Defs.' Mot. 12; Pls.' Mot. 9). To make these determinations, the Court must "'look beyond formalistic corporate separation to the actual pragmatic operation and control, whether unified or, instead, separate as to each unit.'" *Cornell*, 410 F. App'x at 267 (quoting *Donovan v. Grim Hotel Co.*, 747 F.2d 966, 970 (5th Cir. 1984)). The relevant inquiry for the Court, then, is a "flexible" one, *Gonzalez*, 820 F. Supp. 2d at 1368 (citing *id.*), but the Court must find the evidence demonstrates that the two businesses at issue (1) performed related activities, (2) through a unified operation or common control, and (3) for a common business purpose.[14] *See* 29 C.F.R. § 779.202; *Easton Land & Dev., Inc.*, 723 F.2d at 1551 (citing *Dunlop v. Ashy*, 555 F.2d 1228, 1231 (5th Cir. 1977)).

### a. Related Activities

"Activities are related when they are 'the same or similar' or when they are 'auxiliary and service activities.'" *Easton Land & Dev., Inc.*, 723 F.2d at 1551 (quoting S. REP. NO. 87-145, at 31, *reprinted in* 1961 U.S.C.C.A.N. 1620, 1660; and citing *Brennan v. Veterans Cleaning Serv.,*

---

[14] Further, "the [FLSA] definition excludes from the 'enterprise' activities only performed 'for' the enterprise rather than as a part of it by an independent contractor even if they are related to the activities of the enterprise." *Gonzalez*, 820 F. Supp. 2d at 1370 n.2 (quoting 29 C.F.R. § 779.202 (internal quotation marks omitted)).

*Inc.*, 482 F.2d 1362, 1366 (5th Cir. 1973)); *see also Jimenez v. S. Parking, Inc.*, No. 07-23156-CIV, 2008 WL 4279618, at *9 (S.D. Fla. Sept. 16, 2008) (citing *Easton Land & Dev., Inc.*, 723 F.2d at 1551). "Auxiliary and service activities" are activities involving "'operational interdependence in fact.'" *Easton Land & Dev., Inc.*, 723 F.2d at 1551 (quoting *Brennan*, 482 F.2d at 1367; and citing *Wirtz v. Savannah Bank & Trust Co. of Savannah*, 362 F.2d 857, 860–61 (5th Cir. 1966)) (footnote omitted). Thus, the focus of the Court's inquiry is on the "operational interdependence" of Raly and Bravo, or General Recycling and Bravo, and not only on the primary activities of the individual businesses. *See Brennan*, 482 F.2d at 1367.

Although Plaintiffs do not specifically address the related activities of the companies within the section of their Motion concerning joint enterprise status, the Court observes that Plaintiffs do discuss the companies' operational interdependence throughout their briefs. They point out that Raly did not have any capital of its own, and could not pay the workers until it was paid by Bravo; neither Raly nor General Recycling rendered services other than cleaning the Property; Bravo owned the Property which was the site of the rendered services; Bravo owned all of the heavy equipment necessary to clean the Property and undertook all repairs of the equipment, whereas Raly and General Recycling did not own any equipment; Bravo permitted Raly to use the equipment without a fee, although it charged General Recycling for its use; Bravo reimbursed Raly for the workers' protective gear and gasoline for the heavy equipment; and Bravo hired an environmental engineer to assess the progress of the Property's decontamination, as opposed to Raly or General Recycling carrying that burden.

The foregoing evidence shows that Raly had "no work other than that provided by [Bravo], and could not have acted independently, since [it] had no assets." *Jackson v. Art of Life, Inc.*, 836 F. Supp. 2d 226, 237 (E.D. Pa. 2011). Thus, although Defendants point out that

Plaintiffs testified they have no knowledge or information concerning whether Bravo and Raly engaged in related activities (*see* Defs.' Mot. 10), the Court need not ignore the evidence presented by the parties, which shows that the businesses were operationally interdependent in fact.

It is a closer question with regard to General Recycling, as the record does not show that General Recycling lacked its own assets, or that Bravo compensated General Recycling or reimbursed it in a similar manner as it did Raly.  Indeed, General Recycling was charged a fee to use Bravo's equipment.  Nonetheless, the Court observes that in addition to the fact that General Recycling did not render services other than to clean Bravo's Property, both General Recycling and Bravo reported the same principal and mailing addresses to the Florida Department of State. (*Compare* [ECF No. 57-11] (State Department record for General Recycling) (listing principal and mailing addresses as "3250 NW 107 AVE.[,] MIAMI FL 33172"), *with* [ECF No. 57-12] (State Department record for Bravo) (listing principal and mailing addresses as "3250 NW 107TH AVENUE[,] MIAMI FL 33172")).  The parties, however, do not address the import of this observation.  Thus, on this record, there remain questions of fact relevant to the Court's inquiry concerning the interdependence of General Recycling and Bravo.

### b. Unified Operation or Common Control

"In order to constitute an 'enterprise' within the Fair Labor Standards Act, the related activities of the businesses must be conducted 'through unified operation or common control.'" *Easton Land & Dev., Inc.*, 723 F.2d at 1552 (quoting 29 U.S.C. § 203(r)).  "Plaintiff[s] ha[ve] to establish only one of these two alternative requirements."  *Donovan v. Star Bakery, Inc.*, 626 F. Supp. 1208, 1214 (D.P.R. 1986) (citing *Dunlop*, 555 F.2d 1228).  Here, Plaintiffs do not specify which requirement is satisfied (*see* Pls.' Mot. 9), but point out that Hurtado testified he worked

with the "same personnel at all three corporations and all three companies had the same bosses." (*Id.* (citing Hurtado Depo. 85, 87)).  Additionally, Raly and General Recycling both relied on the use of Bravo's heavy equipment and Bravo's maintenance of that equipment to clean the Property.  Plaintiffs also point out that Bravo influenced the hiring, termination, and wage decisions of Raly and General Recycling.  For example, when Gomez was fired by Raly, Gomez met with Vidal to get his job back; when Hurtado's wage was decreased while working for General Recycling, he met with Vidal to rectify it.  (*See* Pls.' Mot. 8).

Defendants, in contrast, assert that only Raly had the ability to make hiring and wage decisions.  (*See* Defs.' Resp. 9 [ECF No. 72]).  Indeed, the record evidence shows that Plaintiffs were paid by Raly or General Recycling; not by Bravo.  Further, Defendants maintain that the "bosses" at all three companies were not the same — Viera was the sole owner of Raly; Cruz was the sole owner of General Recycling; and Vidal was the sole owner of Bravo.

There are clearly issues of material fact concerning whether Raly and General Recycling were under unified operation and common control with Bravo.

### c.  Common Business Purpose

Plaintiffs assert that the common business purpose of Raly and Bravo, or General Recycling and Bravo, was to "clean the plot of land."  (Pls.' Mot. 9).  Defendants assert that the entities maintained different business purposes: Raly and General Recycling were in the business of cleaning, and Bravo was in the business of buying and reselling tires.  (*See* Defs.' Mot. 10; Defs.' SMF ¶ 12).  The parties thus agree that Raly and General Recycling were in the business of "cleaning," but disagree as to Bravo's business purpose.

The record shows that while Bravo's primary or initial business purpose is the purchase and sale of tires, at issue in this matter is the portion of Bravo's business concerned with the

Property.  Bravo owns the Property[15] and the heavy machinery necessary to clean it, and hired Bravo and Raly to have the Property cleaned.  Clearly, Bravo has at least two business purposes, one of which concerns cleaning the Property.  Defendants do not identify anything in the record indicating that the purpose of cleaning up the Property relates to the purchase and resale of tires, or any other purpose.  Based on the present record, the Court finds that Bravo, Raly, and General Recycling all had the common business purpose of cleaning the Property.

Accordingly, the Court finds that only two of the three elements are met to establish a joint enterprise between Raly and Bravo, and only one of the three elements is satisfied to establish a joint enterprise between General Recycling and Bravo.  For these reasons, the parties' motions for summary judgment on this issue are denied.

### iii.  Whether Plaintiffs are Employees

The FLSA's overtime provisions apply only to employees.  The parties ask the Court to determine, as a matter of law, whether Plaintiffs were employees, and if so, who employed them. Defendants assert that Plaintiffs were independent contractors and therefore were not employed by Bravo, Raly, or General Recycling.  Plaintiffs contend that Bravo and Raly jointly employed them, i.e., Plaintiffs were employees of both Bravo and Raly at the same time.[16]  *See Gonzalez-Sanchez v. Int'l Paper Co.*, 346 F.3d 1017, 1020–21 (11th Cir. 2003).

The FLSA defines an "employee" as "any individual employed by an employer."  29 U.S.C. § 203(e)(1).  In turn, the FLSA defines "to employ" as "to suffer or permit to work," 29 U.S.C. § 203(g), and an "employer" as "any person acting . . . in the interest of an employer in

---

[15]  Bravo wholly owns Cima Biam, which owns the Property.

[16]  It is not entirely clear whether Plaintiffs argue in their Motion that Bravo and General Recycling were joint employers of Hurtado.  (*Compare* Pls.' Mot. 1 (requesting summary judgment on the joint employer status of only Bravo and Raly), *with id.* 8 (asserting that "it is undisputed that both Raly . . . and General Recycling . . . were controlled by Bravo . . . .")).

relation to an employee," 29 U.S.C. § 203(d). "In order to determine whether an alleged employer 'suffer[s] or permit[s]' an individual to work, [the Court] ask[s] 'if, as a matter of economic reality, the individual is dependent on the entity.'" *Layton v. DHL Express (USA), Inc.*, No. 11-12532, 2012 WL 2687961, at *3 (11th Cir. July 9, 2012) (quoting *Antenor v. D & S Farms*, 88 F.3d 925, 929 (11th Cir. 1996)); *see also Freund v. Hi-Tech Satellite, Inc.*, 185 F. App'x 782, 782–83 (11th Cir. 2006) (quoting *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 728 (1947)).

> Factors courts consider in approaching this inquiry include, but are not limited to:
>
> (1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed;[17]
> (2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;
> (3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers;
> (4) whether the service rendered requires a special skill;
> (5) the degree of permanency and duration of the working relationship;
> (6) the extent to which the service rendered is an integral part of the alleged employer's business.

*Id.* at 783 (citing *Sec'y of Labor, U.S. Dep't of Labor v. Lauritzen*, 835 F.2d 1529, 1535 (7th Cir. 1987)); *see Layton*, 2012 WL 2687961, at *6 (noting that "the factors are used because they are indicators of economic dependence"); *see also Velez v. Sanchez*, No. 11-90-cv, 2012 WL 3089376, at *13 (2d Cir. July 31, 2012) ("[T]he 'ultimate concern' in distinguishing independent contractors and employees is whether the workers 'depend upon someone else's business for the opportunity to render service or are in business for themselves[.]'" (quoting *Brock v. Superior*

---

[17] "Different cases articulate different tests for ascertaining whether an entity is an 'employer' under the FLSA." *Spears v. Choctaw Cnty. Comm'n*, No. 07-0275-CG-M, 2009 WL 2365188, at *5 (S.D. Ala. July 30, 2009). For example, in *Villarreal v. Woodham*, 113 F.3d 202 (11th Cir. 1997), the court inquired into "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Id.* at 205. In its analysis, the Court accounts for these considerations within its discussion of the first *Freund* factor.

*Care, Inc.*, 840 F.2d 1054, 1059 (2d Cir. 1988))).

The Court first notes that Plaintiffs fail to address why Bravo and Raly were *each* employers of Plaintiffs, or that General Recycling and Bravo *each* employed Hurtado.  Instead, Plaintiffs vaguely refer to Defendants collectively when examining the first, fifth, and sixth *Freund* economic dependence factors, which specifically concern the alleged employer.  (*See* Pls.' Resp. 13 ("*Defendants* controlled the nature and degree of work of Plaintiffs." (emphasis added)); *id.* 14 ("Plaintiffs worked for *Defendants* for extended periods of time . . . . Furthermore, the degree of permanency of Plaintiffs' employment is evident from that [sic] fact that even *Defendant* admitted that even Plaintiffs like Hurtado would show up for work every day . . . ." (emphasis added)); *id.* 14–15 (discussing only Bravo's business purpose before concluding that "the work performed by Plaintiffs, cleaning up the land, was an integral [sic] of what they were hired to do for *Defendants*." (emphasis added)); *see also* Pls.' Mot. 4–8; *id.* 8 ("The facts nevertheless establish that Plaintiffs were economically dependent on their work with *Defendants* . . . ." (emphasis added)).

Such discussion is insufficient for the Court to determine as a matter of law which entities, if any, employed Plaintiffs.[18]  Plaintiffs have identified no law, nor is the Court aware of any, permitting the Court to find that Plaintiffs were employees without identifying who employed them.  Nor do Plaintiffs explain why Defendants can be treated as a single entity for the purposes of the Court's employer analysis. Therefore, Plaintiffs' Motion for Summary Judgment on the issue of whether Plaintiffs were employees and not independent contractors is denied.

---

[18]  Although Plaintiffs note that "[t]here is no dispute that Raly . . . and General Recycling . . . [sic] only job has been for Bravo . . . and the only work these companies ever performed was the clean up work performed for Bravo" (Pls.' Mot. 6; Pls.' Resp. Mot. 15), they fail to explain why these facts are relevant to the inquiry regarding the identity of Plaintiffs' employers, if any.

Although Plaintiffs argue that Raly was controlled by Bravo (*see* Pls.' Mot. 8), Plaintiffs' failure to establish that Bravo, Raly, or General Recycling was their employer is also dispositive of their Motion for Summary Judgment on the issue of Bravo and Raly's joint employment status.  Indeed, to be considered a "joint employer," an entity must first be an employer.  (*See* 29 C.F.R. § 791.2(a) (noting that "[a] single individual may stand in the relation of an employee to two or more employers at the same time under the [FLSA] since there is nothing in the act which prevents an individual employed by one employer from also entering into an employment relationship with a different employer," before addressing how to determine "whether the employment by the employers is to be considered joint employment or separate and distinct employment for purposes of the act").  Thus, Plaintiffs' Motion for Summary Judgment on whether Bravo and Raly were joint employers is also denied.

Defendants also do not engage in any entity-specific discussion concerning Plaintiffs' employment status.  (*See* Defs.' Mot. 12–15).  Nonetheless, the Court observes that several of the *Freund* economic dependence factors the Court considers focus on the putative employee, and not on the alleged employers.  The Court first examines these factors in turn.

As to the second factor, Defendants point out that Plaintiffs each filed a Schedule C to their federal income tax returns, deducting business expenses, which, according to Defendants, "suggests that [Plaintiffs] had an opportunity for profit or loss."  (Defs.' Mot. 14).  These tax return forms, however, do not demonstrate whether Plaintiffs' potential profit or loss was based on managerial skills.  Moreover, the record shows Plaintiffs were paid according to their productivity and number of hours worked (*see* Viera Depo. 21:20–22:7), not their managerial skills.  *See Torres-Lopez v. May*, 111 F.3d 633, 644 (9th Cir. 1997) (finding that plaintiffs had no opportunity for profit or loss depending on their managerial skill because the amount of money

they earned depended solely upon the number of cucumbers they themselves picked).   This factor weighs in favor of an employer-employee relationship.

Similarly, as to the third factor, Defendants again rely on Plaintiffs' Schedule C forms to show that Plaintiffs invested in equipment and materials required for the job.   Defendants do not, however, identify in what equipment or tools Plaintiffs invested, nor whether Plaintiffs used those tools or equipment to clean the Property.   For example, Hurtado did not use any of his own tools and equipment to clean up the Property.   Yet, even assuming Gomez and Blanco used such tools or equipment on the job, Defendants have not shown whether their investment was more than minimal when compared to Bravo's investment in the heavy machinery necessary to sift out contaminants and metals from the Property.   *See, e.g.*, *Castillo v. Givens*, 704 F.2d 181, 192 (5th Cir. 1983) (observing that "[the worker's] investment in hoes was 'minimal in comparison with the total investment in land, heavy machinery and supplies necessary for growing' cotton" (quoting *Real v. Driscoll Strawberry Assocs., Inc.*, 603 F.2d 748, 755 (9th Cir. 1979))).   Here, the heavy equipment was necessary to clean the Property, and Plaintiffs did not pay a fee to use the machinery, did not purchase fuel to run the equipment, nor were Plaintiffs required to reimburse anyone for their safety equipment.   In sum, much of the equipment used by Plaintiffs to perform their jobs was provided to them.   Additionally, the evidence does not show that Plaintiffs employed other workers.   This factor weighs in favor of an employer-employee relationship.

Regarding the fourth factor, the parties dispute whether the job performed by Plaintiffs requires a special skill, specifically, driving and handling the heavy machinery.   Plaintiffs admit that some skills are necessary to operate the equipment, but argue that such skills could be

learned readily as they were easily taught to other workers.[19]  (*See* Pls.' Resp. 14).  Certainly, "[s]kills are not the monopoly of independent contractors."  *Lauritzen*, 835 F.2d at 1537 (citation omitted).  However, as the present record elucidates little the nature or degree of the skill necessary to drive and handle the heavy machinery, this factor rests at equipoise.

Thus, factors two through four do not weigh in favor of independent contractor status. The remaining factors require an inquiry into each putative employer, in which Defendants have failed to engage.  Certainly, as to the first factor, Defendants do not discuss the nature and degree of control Bravo, Raly, or General Recycling had over Plaintiffs, but rather assert that Plaintiffs had control over various areas of their work.  Defendants do not explain why Plaintiffs' control over certain aspects of their work amounts to "minimal" control by Bravo, Raly, or General Recycling, when no aspect of Bravo's Raly's, or General Recycling's control is discussed. (Defs.' Mot. 13–14).

As to the fifth factor, which concerns the degree of permanency and duration of the working relationship between Plaintiffs and each putative employer, Defendants again do not address each relationship.  Instead, they note that Plaintiffs conceded they "had the . . . freedom to work for other companies" while working on the Property.  (*Id.* 14).  However, such "freedom" alone does not tip this factor in favor of independent contractor status, as "[a]n employee may, of course, work for different employers at different times and still be an employee of each."  *Beliz v. W.H. McLeod & Sons Packing Co.*, 765 F.2d 1317, 1329 (5th Cir. 1985).  Without further explanation, the Court does not find this factor to tip in favor of independent contractor status.[20]

---

[19]  Plaintiffs fail to cite to the record to support this proposition despite asserting that Plaintiffs' testimony supports it. (*See* Pls.' Resp. 14; Pls.' Mot. 5).

[20]  Defendants urge the Court to consider such "freedom" dispositive of the issue of Plaintiffs' independent contractor status. (*See* Defs.' Mot. 13).  However, for the foregoing reasons, *see supra* 24–

Defendants do not address the sixth factor.  (*See* Defs.' Mot. 12–15).

Outside these six factors, Defendants also urge the Court to consider Plaintiffs' federal income tax returns wherein they deducted business expenses and listed their earnings from their work on the Property as business income, and not wages.  According to Defendants, this shows that Plaintiffs agreed to be independent contractors of Raly and General Recycling.  But "[w]hether or not the parties intended to create an employment relationship is irrelevant" to the Court's analysis.  *Santelices*, 147 F. Supp. 2d at 1319 (citing *Donovan v. New Floridian Hotel*, 676 F.2d 468, 471 (11th Cir. 1982)).  Moreover, it is not clear on the present record whether the business expense deductions related to Plaintiffs' work on the Property.  (*See e.g.*, Pls.' SMF ¶ 1; Viera Depo. 11:12–14 (Hurtado did not use any of his own tools or equipment to clean the Property)).  In any event, even if Plaintiffs' deductions related to work done on the Property, this factor alone is not dispositive, and must be considered with the circumstances as a whole.  *See supra* 23; *see also Lindlsey v. Bellsouth Telecommc'ns., Inc.*, No. 07-6569, 2009 WL 537159, at *3 (E.D. La. 2009); *Carrell v. Sunland Constr., Inc.*, 998 F.2d 330, 333–34 (5th Cir. 1993).  The Court does not find this factor to weigh in favor of independent contractor status.

The Court, having considered the relevant economic dependence factors, denies Defendants' Motion for Summary Judgment on the issue of Plaintiffs' independent contractor status.  Additionally, as Defendants have not demonstrated that Bravo is not an employer of Plaintiffs, Defendants' Motion for Summary Judgment on the issue of joint employment is also denied.  Indeed, Defendants correctly point out that "courts have . . . limit[ed] 'FLSA liability to cases in which defendants, based on the totality of the circumstances, function as employers of

---

25, it is not evident why this factor tips in favor of independent contractor status.  Further, "no one factor is controlling."  *Scantland v. Jeffry Knight, Inc.*, No. 8:09-CV-1985-T-17TBM, 2012 WL 1080361, at *6 (M.D. Fla. Mar. 29, 2012) (quoting *Santelices v. Cable Wiring*, 147 F. Supp. 2d 1313, 1319 (S.D. Fla. 2001)) (internal brackets omitted)).

the plaintiffs rather than mere business partners of plaintiff[s'] direct employer" (Defs.' Mot. 11

(quoting *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 76 (2d Cir. 2003)), in addition to other

relevant factors.  (*See* Defs.' Mot. 12).  And yet, Defendants do not meet this standard as they

discuss only the extent of Bravo's supervision over Plaintiffs, which is but one factor relevant to

Bravo's employer status.  (*See* Defs.' Mot. 11).  For these reasons, summary judgment on this

issue is denied.

## C.  Liability of the Individual Defendants

Defendants assert that the individual defendants in this matter — Vidal, Emmanuel,

Viera, and Cruz — are not liable for any of Plaintiffs' claims because

> First, due to the fact that the Court is without subject matter jurisdiction in this
> case, and also because the individual Defendants' liability is only derivative to
> that of a respective Corporate-Defendant's liability, the individual Defendants are
> entitled to summary judgment.  Alternatively, the individual Defendants are also
> entitled to summary judgment concerning the following respective Corporate-
> Defendants: Defendant Emmanuel Suriel with respect to *all* Corporate-
> Defendants; Defendant Vidal Suriel with respect to Defendant Raly and
> Defendant General Recycling; Defendant Israel Viera with respect to Defendant
> General Recycling and Defendant Bravo; and Defendant Cruz with respect to
> Defendant Raly and Defendant Bravo.

(Defs.' Mot. 9 (citations omitted)).

Defendants' first argument is rejected as the Court has already found that enterprise

coverage rests on disputed issues of fact, and therefore, Bravo, Raly, and General Recycling

remain subject to suit.  As such, it cannot be concluded that the individual defendants lack

derivative liability simply because the corporations are not liable — as the court found in *Zarate*

*v. Jamie Underground, Inc.*, 629 F. Supp. 2d 1328, 1336 (S.D. Fla. 2009) (citation omitted) —

because here, the liability of Bravo, Raly, and General Recycling is not yet determined.

Defendants' alternative argument presents no reasoning why summary judgment is appropriate.[21] Therefore, on this issue, summary judgment is denied.

### D. Successor Liability of General Recycling

Plaintiffs assert that General Recycling is a successor of Raly, and therefore is liable for Raly's FLSA's violations, if any. (*See* Pls.' Mot. 9–11). Plaintiffs cite to *Steinbach v. Hubbard*, 51 F.3d 843, 844 (9th Cir. 1995), for the proposition that successor liability exists under the FLSA. (*See id.* 9–10). Notably, the *Steinbach* court acknowledged that the question of whether successor liability exists under the FLSA was, at that time, one of first impression. *See Steinbach*, 51 F.3d at 844. Plaintiffs provide no law from this district or the Eleventh Circuit which finds that successor liability exists under the FLSA. Nor do Plaintiffs explain why the Court should adopt the legal standards laid out in *Steinbach*, which applied the successor liability principles from National Labor Relations Act ("NLRA") claims to FLSA claims. *See id.*; *see also*, *Battino v. Cornelia Fifth Ave., LLC*, No. 09 Civ. 4113 (JPO) (MHD), 2012 WL 1871070, at *6–10 (S.D.N.Y. May 24, 2012) (examining which of various tests for successor liability used by courts in FLSA cases is appropriate).

*Steinbach* sets forth two elements necessary to demonstrate successor liability in FLSA cases: "1) the subsequent employer was a bona fide successor and 2) the subsequent employer had notice of the potential liability. *Steinbach*, 51 F.3d at 846 (citation omitted). Equity principles are also considered. *See id.*

Even if the Court were to apply *Steinbach*'s test here, Plaintiffs have failed to

---

[21] In their discussion on this issue, Defendants cite to paragraphs 21 through 24 of their statement of facts. (*See* Defs.' Mot. 9 (citing Defs.' SMF ¶¶ 21–24). It is not for the Court to piece together an argument based on citations to facts. Further, it is inappropriate to raise legal argument in a statement of material fact. *See, e.g.*, *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000) ("[A] movant's 56.1(a) statement should contain *only* factual allegations. It is inappropriate to allege legal conclusions in a 56.1(a) statement . . . .") (emphasis in original); *Blackhawk Molding Co., Inc. v. Portola Packaging, Inc.*, 422 F. Supp. 2d 948, 959 n.7 (N.D. Ill. 2006) (citing *id.*).

demonstrate that their argument meets its standards.  Foremost, Plaintiffs identify nothing in the record regarding whether General Recycling had notice of Raly's potential liability. Significantly, this suit was not filed until December 13, 2011 (*see* Compl. [ECF No. 1]), after both Raly's and General Recycling's service to Bravo had ended.

Second, although Plaintiffs point out that (1) General Recycling's owner, Cruz, had been a supervisor when he worked for Raly, and (2) General Recycling hired some of Raly's crew, they fail to explain why these events demonstrate General Recycling was Raly's bona fide successor.  *See Steinbach*, 51 F.3d at 846 ("Whether an employer qualifies as a bona fide successor will hinge principally on the degree of business continuity between the successor and predecessor.").  Indeed, Plaintiffs point out that General Recycling replaced Raly because Bravo fired Raly, which tends to show a lack of "business continuity."  Additionally, although Plaintiffs do note General Recycling performed the same job for Bravo as had Raly, and also used Bravo's equipment, this demonstrates the similarities of General Recycling's relationship with Bravo, and Raly's relationship with Bravo.  It does not illuminate General Recycling's relationship with Raly.

Third, Plaintiffs offer no discussion of equitable considerations.  Rather, they cite to law for the proposition that "'it would be grossly unfair . . . to impose successor liability on an innocent purchaser when the predecessor is fully capable of providing relief'" (Pls.' Mot. 10 (quoting *Musikiwamba v. ESSI, Inc.*, 760 F.2d 740, 750 (7th Cir. 1985))), without addressing whether Raly is "fully capable of providing relief," nor whether General Recycling was an "innocent" participant that should not be held liable for Raly's violations.

For these reasons, Plaintiffs have not demonstrated summary judgment is warranted on this issue.

### E. Specific Weeks Where Plaintiffs Did Not Work Overtime

Defendants ask the Court to grant summary judgment in favor of Defendants as to specific weeks wherein Plaintiffs admitted they did not work overtime. (*See* Defs.' Mot. 15 (failing to identify the relevant weeks in their Motion, but citing to Defs.' SMF ¶¶ 17–19, which indicate the specified weeks for each Plaintiff)). As to the periods identified by Defendants for Hurtado and Gomez, Plaintiffs point out that they are not seeking overtime for those periods. (*See* Pls.' Resp. 15). Thus, summary judgment on this issue with respect to Hurtado and Gomez is denied as moot.

Defendants also contend Blanco did not work overtime in particular weeks during August through October 2010, and January through March 2011. (*See* Defs.' Mot. 15 (citing Defs.' SMF ¶¶ 17–19); Defs.' SMF ¶ 19 (identifying individual weeks where Blanco purportedly did not work overtime)). Defendants determined these non-overtime periods by examining paychecks for particular workweeks; if the check was for an amount equal to or less than $520, it was concluded that no overtime was worked during that week. (*See* Blanco Depo. 140:13– 141:7). Defendants' conclusions, however, hinge on the assumption that Blanco earned only $13 per hour and that Blanco was only compensated by check. However, it remains a disputed issue of fact whether Blanco was paid only $13 per hour or "a little bit more" (*id.* 140:21–23), and whether the amount of Blanco's paychecks reflects his total compensation, given that he asserts he was also paid in cash. (*See id.* 145:4–5). For these reasons, summary judgment on this issue with respect to Blanco is denied.[22]

---

[22] As noted, Defendants do not identify in their Motion the specific weeks they assert each Plaintiff did not work for which they seek summary judgment. Rather, Defendants merely reference paragraphs 17 through 19 of their Statement of Facts. (*See* Defs.' Mot. 15). The last sentence of Paragraph 19 of Defendants' Statement of Facts asserts that "Blanco . . . concedes that he is not claiming overtime for the approximately one to two weeks that he did not work around Christmas of 2010." (Defs.' SMF ¶ 19). Plaintiffs did not respond to this specific assertion, nor did Defendants note Plaintiffs' failure in their

**F.  Evidence of Damages**

Defendants argue that Plaintiffs' "failure to explain how their damages were calculated, and failure to articulate what they would be willing to settle for" during deposition demonstrates a lack of competent evidence on damages, warranting summary judgment on all claims.  (*See* Defs.' Mot. 16).  This argument, as presented, is illogical.  Certainly, one's inability to articulate mathematical calculations does not mean there is a dearth of evidence to support damages.  Summary judgment on this ground is denied.

**G.  Holiday Pay**

Defendants observe that Hurtado testified that he is also suing for double-time "holiday pay." (Defs.' Mot. 19).  Defendants ask the Court to rule that Hurtado is not entitled to holiday pay because he failed to plead it and because the FLSA does not provide for recovery of "holiday pay."  (*See id.*).  Plaintiffs acknowledge they are not claiming holiday pay for Hurtado.  (*See* Pls.' Resp. 16).  Thus, as there is no disputed issue for the Court, summary judgment with respect to any "holiday pay" for Hurtado is denied as moot.

**H.  Whether Gomez and Blanco Disavowed Their Claims Against Each Defendant Other Than Raly**

Defendants point out that the deposition testimony of Gomez and Blanco indicates they only intend to sue Raly, and therefore have abandoned their claims with respect to all other Defendants.  (*See* Defs.' Mot. 18).  Plaintiffs counter that during their depositions, Gomez and Blanco "were asked a series of leading questions as to the individual Defendants" (Pls.' Resp. 16), and point out that Gomez and Blanco acknowledged they were aware of all of the named Defendants in the lawsuit before opting in.  (*See* Pls.' Resp. 16).

---

Reply.  (*See generally* Pls.' Resp.; Defs.' Reply).  Given the peculiar manner in which Defendants raised this issue in their Motion (namely, by reference to another filed document) and that it does not appear the parties discussed the merits of Defendants' request, the Court, out of an abundance of caution, denies summary judgment on this issue.

The Court notes that much of the deposition testimony identified by Defendants indicates that Gomez or Blanco lacked prior intent (at some unspecified point in time), not current intent, to sue Defendants other than Raly.  (*See, e.g.*, Gomez Depo. 107:25–108:5 ("Q. And you said with respect to every defendant . . . , except for Raly, that you never *had any intention* of suing any other defendant other than Raly . . . ?  A.  Correct . . . .") (emphasis added)).  At most, then, it appears there is a question of fact regarding who each Plaintiff seeks to hold liable for on his claims.  Summary judgment on this issue is denied.[23]

## I.  Willfulness

Defendants argue that they are entitled to summary judgment on any of Plaintiffs' claims that fall outside a two-year statutory limitations period.  (*See* Defs.' Mot. 19).  According to Defendants, Plaintiffs "admitted that any alleged failure to pay them overtime was not willful" (*id.*), and therefore Plaintiffs are only entitled to a two-year limitations period, not the three-year period applicable to willful violations of the FLSA.  (*Id.* (citing 29 U.S.C. § 255(a)).  Further, Defendants argue that because Plaintiffs admitted Defendants did not act willfully, the Court can conclude as a matter of law that Defendants acted reasonably, and therefore are not liable for any claims of liquidated damages.  (*See id.*).

Plaintiffs correctly point out that "[t]he issue of willfulness is not applicable as it relates to the statute of limitations."  (Pls.' Resp. 16).  The Complaint was filed on December 13, 2011, and amended on March 28, 2012 to add Blanco and Gomez as Plaintiffs.  Even when considering the later March 28, 2012 date, Plaintiffs would be permitted to bring claims dating as far back as March 28, 2010.  The date of the earliest violation claimed by Plaintiffs is June 2010, when

---

[23]  To the extent Defendants assert Plaintiffs' attorneys have violated Florida Bar Rules and warrant sanction by the Court (*see* Defs.' Mot. 18), such issues are not appropriately raised on a motion for summary judgment.

Hurtado alleges to have worked for Bravo.  Accordingly, there is no dispositive legal issue for the Court to decide, and therefore Defendants' Motion for Summary Judgment on this issue is denied as moot.

The Court next addresses Defendants' argument that Plaintiffs' admission that Defendants did not act willfully necessarily means Plaintiffs may not recover liquidated damages.  The FLSA provides:

> [I]f the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA] the court may, in its sound discretion, award no liquidated damages . . . ."

29 U.S.C. § 260.

The only evidence presented by Defendants in support of the showing considered in 29 U.S.C. section 260 is Plaintiffs' "admissions."  (*See, e.g.*, Hurtado Depo. 183:10 – 13 ("Q. And surely you agree with me that any failure to pay you overtime was not willful; correct? . . . .  A. Correct."); Blanco Depo. 129:9–12 ("Q. And surely you agree that any failure to pay you overtime was not willful; correct? . . . .  A. Correct.")).  In effect, Defendants asked Plaintiffs during their depositions to evaluate facts and apply law, and now assert Plaintiffs' answers as "fact" in their Motion for Summary Judgment.  The Court considers these "admissions" wholly inadequate to demonstrate whether Defendants acted in "good faith" or had "reasonable grounds" for believing that their alleged acts or omissions were not in violation of the FLSA.  How would Plaintiffs have any insight as to what Defendants believed and the grounds therefor?  The Court declines to exercise its discretion to rule at this stage of the litigation, and on this record, that Plaintiffs are not entitled to liquidated damages.

For the foregoing reasons, summary judgment on this issue is denied.

Case No. 11-24476-CIV-ALTONAGA/Simonton

## IV.  CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1)  Defendants' Motion for Summary Judgment **[ECF No. 56]** is **DENIED**.

2)  Plaintiffs' Motion for Summary Judgment **[ECF No. 58]** is **DENIED**.

3)  Plaintiffs shall file a Statement of Claim for Gomez and Blanco, setting forth the amount of alleged unpaid wages, the calculation of such wages, and the nature of the wages (e.g., overtime or regular) on or before **August 30, 2012**.  Plaintiffs shall promptly serve a copy of this Order and the Statement of Claim on Defendants. Plaintiffs shall also file a Notice with the Court indicating the date and manner the Plaintiffs served Defendants with the Statement of Claim.  A deadline for Defendants' response shall be set at the status conference the parties are to schedule with the Court in compliance with the Order dated August 17, 2012 [ECF No. 103].

**DONE AND ORDERED** in Chambers at Miami, Florida, this 27th day of August, 2012.

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record; Defendants